**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| NICHOLE L. IRWIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:12-cv-00803-TWP-TAB |
| | ) | |
| CAROLYN COLVIN, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Nichole L. Irwin ("Ms. Irwin") requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). For the reasons set forth below, the Court **AFFIRMS** the decision of the Commissioner.

**I.   BACKGROUND**

**A.   Procedural History**

On August 8, 2009, Ms. Irwin filed an application for DIB, alleging a disability onset date of October 13, 2006. Ms. Irwin's application was denied initially on November 6, 2009, and upon reconsideration on January 21, 2010. Thereafter, a disability hearing was held on March 2, 2011. Ms. Irwin was represented by counsel at the hearing. On March 9, 2011, Administrative Law Judge Albert J. Velasquez ("the ALJ") denied Ms. Irwin's applications. Ms. Irwin requested a review by the Appeals Council, and the Appeals Council denied Ms. Irwin's request for review of the ALJ's decision on April 26, 2012, thus making it the final decision of

the Commissioner for purposes of judicial review.  On June 12, 2012, Ms. Irwin filed this civil

action, pursuant to 42 U.S.C. § 405(g), for review of the ALJ's decision.

## B.      Factual Background

Ms. Irwin had previously worked as a bus driver transporting disabled people and "she

quit the job in 2006."(Dkt. 19 at 24). On August 20, 2007, her primary care physician, Dr.

Sampson, gave Ms. Irwin a medical examination. According to the medical record, Ms. Irwin

weighed 311.8 pounds and had a body mass index of 53.30, which indicates morbid obesity.  Ms.

Irwin had hip pain for the past three days caused by fibromyalgia. Dr. Hampton assessed Ms.

Irwin's morbid obesity and fibromyalgia as unchanged and prescribed Voltaren and Vicodin.

On June 25, 2008, Dr. Condit, a rheumatologist, evaluated Ms. Irwin.  Ms. Irwin had pain

in multiple areas, mostly in the muscles but not in the joints.  Most of the pain was in her legs,

and Ms. Irwin complained that her muscles felt swollen.  The examination revealed multiple

tender points.  Dr. Condit noted that Ms. Irwin had problems with her weight, fatigue, headaches,

dizziness, non-specific numbness, tingling, and muscle spasm.  On November 3, 2008, Dr.

Condit treated Ms. Irwin again.  Ms. Irwin reported increased pain and she had been without

Cymbalta medication for several weeks.  The drug Relafen was not helpful, therefore Dr. Condit

continued her on Cymbalta.

Dr. Condit next treated Ms. Irwin on March 10, 2009.  According to the record, Ms.

Irwin's pain fluctuated with the weather.  She was not sleeping well and Ms. Irwin felt that she

needed a higher dose of Celexa, so the Celexa was increased.  On June 18, 2009, Ms. Irwin saw

Dr. Condit for continued problems with fibromyalgia.  Ms. Irwin had hip pain and pain over the

left greater trochanter.  Dr. Condit injected the hip with Celestone and continued Ms. Irwin's

current medications.  On September 8, 2009, Dr. Condit again treated Ms. Irwin.  Ms. Irwin was

having muscle spasms in her back, for which Dr. Condit recommended physical therapy. Naproxen was also added to Ms. Irwin's medications.

On March 8, 2010, Dr. Condit treated Ms. Irwin for subacromial bursitis pain on the right side and DeQuervain's syndrome pain.  Dr. Condit discontinued the regular use of Hydrocodone, and directed Ms. Irwin that it should be used for only back pain.  At a January 6, 2011 visit to Dr. Condit, Ms. Irwin complained of wrist pain, so Dr. Condit injected Celestone and Xefo into her wrist.

On June 4, 2009, Dr. Lynch, Ph.D., gave Ms. Irwin a psychological evaluation for Social Security.  Ms. Irwin told Dr. Lynch she most recently worked at Indy-Go for eight and a half years, where she opened doors for disabled people.  She quit that job in 2006.  As for Ms. Irwin's life activities, she told Dr. Lynch that both she and her husband managed the finances, she shopped twice a month, she went bowling once a week, and she attended church and interacted with her children.  During the mental status examination, Dr. Lynch concluded that Ms. Irwin had insomnia, depression, frequent fatigue, decreased sleep, and extended episodes of irritable mood.  Dr. Lynch diagnosed Ms. Irwin with mood disorder NOS, fibromyalgia, and stated that her Global Assessment of Functioning ("GAF") score was 54.

## II.   DISABILITY AND STANDARD OF REVIEW

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous

work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities) that meets the durational requirement, she is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii). In order to determine steps four and five, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), which is the "maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 416.920(a)(4)(v).

In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman*

4

*v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).   While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome."  *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be based upon consideration of all the relevant evidence."  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability.  *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III.   THE ALJ'S DECISION

At step one, the ALJ found that Ms. Irwin had not engaged in substantial gainful activity since October 13, 2006.  At step two, the ALJ found that Ms. Irwin had the following severe impairments: obesity, fibromyalgia, late effect of carpal tunnel syndrome release, and depression.  At step three, the ALJ considered Listing 1.01 (Major Dysfunction of a Joint), Listing 12.04 (Affective Disorders), and Social Security Ruling 02-1.  The ALJ found that Ms. Irwin did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  At step four, the ALJ found that Ms. Irwin was unable to perform her past relevant work.  At step five, the ALJ found that considering Ms. Irwin's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that she can perform, thus she is not

disabled for purposes of the Act from her alleged onset date through the date of the ALJ's decision.

## IV.   DISCUSSION

Ms. Irwin raises three issues in her appeal that she claims constitute reversible error. First, she argues there is substantial evidence to prove fibromyalgia and chronic pain, and she should receive DIB.  Second, she argues that the ALJ's credibility determination is contrary to Social Security Ruling 96-7p.  Third, she argues that the ALJ erred at step five in determining that Ms. Irwin was able to perform some jobs in the national economy.

**A.     Whether there is substantial evidence to support the ALJ's RFC determination.**

The RFC is the ALJ's "administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  SSR 96-8p, 1996 WL 374184 (July 2, 1996).  The ALJ is responsible for making the determination of what the RFC is, *Diaz v. Chater*, 55 F.3d 300, 306 n. 2 (7th Cir. 1995), and whether a claimant is legally disabled after reviewing all of the medical sources.  20 C.F.R. § 404.1527(d)(1).

**1.     Whether the ALJ misunderstood the disease.**

Ms. Irwin contends that the ALJ in this case misunderstood fibromyalgia and therefore improperly denied her claim.  For support, Ms. Irwin cites *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996), which reversed a case where a claimant had fibromyalgia because the ALJ had a "pervasive misunderstanding of the disease."   The court stated that fibromyalgia's "cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet*, 78 F.3d at 306.  Although fibromyalgia is diagnosed in large

part by the presence of subjective symptoms, an ALJ is required by law to consider whether there are objective findings supporting a claimant's subjective symptoms.  See *Davis v. Massanari*, No. IP 00-1444-C-H/G, 2001 WL 1175093, at *9 (S.D. Ind. Sept. 6, 2011) (discussing chronic fatigue syndrome).  When faced with a claimant with fibromyalgia an ALJ must consider both the subjective symptoms and any objective medical findings.  If the claimant's subjective complaint of pain is supported by other evidence in the record, then the ALJ must not ignore the subjective complaint.  *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000).

In *Sarchet*, the ALJ misunderstood certain medical terms, misunderstood the plaintiff's testimony, misunderstood the vocational expert, and made a number of unfounded sociological speculations.  78 F.3d at 307-08.  In the context of Ms. Irwin's case, the Commissioner points out that that these factors in *Sarchet* are not present in this case.  Instead, here the ALJ noted that Ms. Irwin experienced the following subjective symptoms:  migraines, depression, severe lower back pain, neck pain, and spasms in her back and feet.  The ALJ did not rely solely on the objective evidence; the ALJ compared Ms. Irwin's claims of pain to the treating physicians' observations in their examinations.  For example, although Ms. Irwin has alleged difficulty with her shoulders and lifting her arms above her head, the ALJ noted that medical records indicate she had normal range of motion in the upper extremities and denied pain with raising her hand over her head or moving her right arm across her chest.  See R. at 21.  Further, Ms. Irwin has not had any problems with her personal care, except for styling her hair.  R. at 18.  She has been able to complete household chores, such as laundry, house cleaning, and sweeping.  R. at 18. Therefore, the ALJ properly considered Ms. Irwin's subjective complaints of fibromyalgia and his detailed opinion does not suggest a misunderstanding of the disease.

2.      **Whether the ALJ selectively considered medical evaluations.**

Ms. Irwin contends that the ALJ only selectively considered her medical evaluations, which, Ms. Irwin argues, if properly considered support a finding of disability.  "An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability."  *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).  On the other hand, "[a] decision denying benefits need not discuss every piece of evidence, but when an ALJ fails to support [his or] her conclusions adequately, remand is appropriate."  *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).  If a physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence," then it deserves "controlling weight."  *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)).  However, if an ALJ does not give a medical opinion controlling weight, then the ALJ must have a good reason.  *Larson*, 615 F.3d at 749.

Specifically, Ms. Irwin claims that the ALJ ignored Dr. Condit's findings in his letter that she has been in pain for 2 years, she felt like her muscles were swelling in her legs, had multiple tender points, muscle spasms in her feet, fatigue, and headaches.  Dr. Condit also found that she had pain/tenderness of the greater trochanters and over the anserine bursae.  Two medical reports that are dated November 3, 2008 and March 10, 2009 state that Ms. Irwin continued to have problems with fibromyalgia and chronic pain.  The ALJ noted that Ms. Irwin was in pain, but as previously discussed, the ALJ determined that Ms. Irwin's "alleged symptoms . . . concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment."  R. at 21.  The ALJ cited Dr. Condit's letter and considered that Ms. Irwin had severe fibromyalgia, but the ALJ

8

did not find sufficient evidence that Ms. Irwin could not perform at the limited level.  The ALJ

used information about Ms. Irwin's condition to limit Ms. Irwin to light level type of activities

and limited certain types of activities, such us climbing ropes, ladders, or scaffolds and not

kneeling or crawling.

Ms. Irwin takes issue with the ALJ's finding that her fibromyalgia is unchanged and there

were no significant changes made to her medications.  Ms. Irwin states that the only medical

records that claim her medical condition is unchanged are the records dated July 13, 2007 and

August 20, 2007.  However, the Court finds that the other records with Ms. Irwin's assessments

do not mention her fibromyalgia, except for a record dated November 21, 2005, which was

before the onset date.  Therefore, substantial evidence supports the ALJ's conclusion.

Ms. Irwin claims that the ALJ selectively considered that she had "normal overhead

range of motion," R. at 21, when the record dated August 20, 2007 never mentioned "overhead

range of motion."  However, the Court found that the medical evaluation dated August 20, 2007,

states that the right upper extremity and the left upper extremity both have normal range of

motion.  R. at 253.  The Court does not find a material difference.  The ALJ further noted that

when Ms. Irwin "was unable to rotate her right shoulder to allow her hand to touch her lower

back," she still denied pain from the movement.  R. at 21, 261.  The ALJ used this information to

limit Ms. Irwin from handling vibrating tools or performing overhead work.

Ms. Irwin further argues that the ALJ ignored the diagnosis that she had a GAF score of

54 and a mood disorder, which caused her to have conflicts with her co-workers and

supervisors.[1]  However, the ALJ did not ignore the GAF score, which is a "useful [tool] for

---

[1] Axis V of the Diagnostic and Statistical Manual of Mental Disorders Fourth Edition Text Revision ("DSM-IV-TR") reports overall functioning using the GAF Scale. The GAF Scale may be useful in tracking the clinical progress of individuals in global terms, using a single measure.  The GAF Scale is divided into 10 ranges of functioning.  Making a GAF rating involves picking a single value that best reflects the individual's overall level of

planning treatment and are measures of both severity of symptoms and functional level." *Denton*

*v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citations omitted) (internal quotations omitted).

The ALJ is not required "to determine the extent of an individual's disability based entirely on

[her] GAF score." *Id.* at 425 (citing *Wilkins v. Barnhart*, 69 F.App'x 775, 780 (7th Cir. 2003)).

Here, the ALJ found that Ms. Irwin had "moderate difficulties" in social functioning, because

although she was irritable and had outbursts at her last job, Ms. Irwin has interacted with friends,

family, and neighbors on a frequent basis.  A GAF score of 54 indicates moderate symptoms,

which the ALJ recognized by noting that Ms. Irwin has moderate difficulties in social

functioning and anger issues.  R. at 18.

Ms. Irwin also argues that the ALJ ignored the psychological impairment found during

the mental status examination.  However, the ALJ concluded that although Ms. Irwin did have a

mental impairment, it did not affect her daily activities, which include cooking, household

chores, finances, and grooming. The ALJ also concluded that although Ms. Irwin has had

conflicts with co-workers and supervisors, she has not had problems socializing with family,

friends, neighbors, or authority figures on a frequent basis.  Furthermore, Ms. Irwin is able to pay

attention for thirty minutes and follow written and spoken instructions.  Finally, the ALJ noted

that Ms. Irwin has not provided proof that she has experienced repeated episodes of

decompensation and that Ms. Irwin has remained "oriented with no evidence of delusions or

hallucinations."  R. at 19.  Episodes of decompensation are "temporary increases in symptoms or

signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing

activities of daily living, maintaining social relationships, or maintaining concentration,

persistence, or pace."  20 CFR Pt. 404, Subpart P, App. 1.  "An incident—such as hospitalization

---

functioning. The description of each 10-point range in the GAF scale has two components:  the first part covers symptom severity, and the second part covers functioning.  DSM-IV-TR 34 (4th ed. 2000).  A GAF score of 51-60 denotes moderate symptoms.  DSM-IV-TR 32–34.

or placement in a halfway house—that signals the need for a more structured psychological support system would" be an example of an episode of decompensation.  *Larson*, 615 F.3d at 750 (citing 20 CFR Pt. 404, Subpart P, App. 1 § 12.00).  Ms. Irwin claims that the ALJ erred, because "delusions or hallucinations" are not related to "orientation."  Yet, Ms. Irwin points to no evidence that supports a finding of episodes of decompensation.  Moreover, the ALJ also noted that there is no evidence that Ms. Irwin is unable to function outside a highly supportive living arrangement, which could indicate episodes of decompensation.  The ALJ supported his conclusion by stating "claimant is able to perform daily living activities independently, such as household chores."  R. at 19.

Therefore, the Court finds the ALJ's RFC determination is supported by substantial evidence.

**B.      Whether the credibility determination is contrary to Social Security Ruling 96-7p.**

Ms. Irwin claims that the ALJ's negative credibility determination is contrary to the evidence and Social Security Ruling 96-7p.  Social Security Ruling 96-7p states that:

> [a]llegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence. . . . [T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.

The ALJ's credibility determination states:

> [a]fter careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment for the reasons described below.

R. at 21.

A court should not remand due to an ALJ's credibility finding unless the credibility determination is "unreasonable or unsupported." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). The Seventh Circuit has stated that boilerplate language in the credibility determination, such as, "statements concerning the intensity, persistence, and limiting effects of [the claimant's] symptoms [are] not credible," is unhelpful. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (internal quotations omitted) (citations omitted). This language "implies that the ability to work is determined first and is then used to determine the claimant's credibility," which the Seventh Circuit describes as backwards. *Shauger*, 675 F.3d at 696. In *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012), the Seventh Circuit explained that the ALJ's backwards procedure — consisting of first determining the claimant's residual functional capacity and then determining her credibility — was erroneous, because "[d]oubts about credibility [are] critical to his [or her] assessment to work."

Ms. Irwin claims that the ALJ's credibility determination is erroneous, because it is perfunctory. In *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011), the Seventh Circuit stated that the boilerplate's language, "the claimant's medically determinable impairments could reasonably be expected to produce some symptoms, but . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible," was perfunctory. In *Martinez*, the ALJ did not explain which statements were entirely credible and which were not. *Id.* at 696. Here, the ALJ found that some of the medical records were inconsistent with Ms. Irwin's daily activities, which included bowling once a week, caring for her children, cooking, doing chores, shopping, helping with her church's summer camp, and maintaining the finances. R. at 23. In *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000), the Seventh Circuit affirmed the ALJ's determination that the claimant's activities, such as shopping,

socializing, and household chores, were inconsistent with the medical testimony about the claimant's pain. Because Ms. Irwin's daily and weekly activities involve concentration and physical activity, the Court finds that the credibility determination is not perfunctory.

**C.    Whether the ALJ erred in step five.**

> The hypothetical posed to the vocational expert ("VE") was:
>
> Let's assume a hypothetical person of the Claimant's age, education, and work experience is able to lift and carry 20 pounds occasionally, 10 pounds frequently; can stand and work for 6 of 8 hours. . . . The work should be simple repetitive in nature and should not require more than superficial interaction with the general public, coworkers or supervisors, and should not require repetitive, forceful gripping, and should not require overhead work. Given that residual capacity, is there any work such a person could do, and to the extent that your opinion may conflict with anything in the DOT or the SOC, please explain the conflict and how you resolved it.

R. at 490-91.

Ms. Irwin claims that the ALJ's hypothetical question to the VE failed to account for her deficiencies in social functioning. The ALJ must pose a hypothetical that contains all limitations "to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of applicant's limitations." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). An ALJ must "incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007). As stated above, the ALJ's credibility determination is well-supported, and Ms. Irwin has moderate difficulties in social functioning. Because Ms. Irwin has moderate difficulties and has had conflicts with her co-workers and supervisor in the past, the Court finds that the language used in the hypothetical, "should not require more than superficial interaction with the general public, coworkers, or supervisors," accounted for Ms. Irwin's deficiencies in social functioning. R. at 20, 490-91.

Ms. Irwin also claims that the ALJ's step 5 determination omits consideration of the VE's

testimony.  Ms. Irwin's attorney posed to the VE this hypothetical:

> Please assume a person of the Claimant's age, education, and experience, whose ability to stand is limited to 20 minutes, . . . lifting is limited to 10 pounds, sitting is limited to 30 minutes.  She has frequent mood swings. . . .  She has spasms and cramps in her feet, which require her to sit down and massage her feet at unplanned intervals during the day.  Would that person be able to sustain any competitive employment?

R. at 492.  The VE responded, "none whatsoever."  R. at 492.  Ms. Irwin testified that she can

stand and sit for thirty minutes, walk for one-half block, and lift only ten pounds.  However, in a

physical consultation, Ms. Irwin stated that she can stand for up to two hours, alternatingly

sitting, and able to lift 25 pounds in each hand.  Because the attorney's hypothetical is

inconsistent with Ms. Irwin's statement in the physical consultation and with the RFC, the ALJ

was not required to include the attorney's hypothetical or the VE's response in the final decision.

Therefore, the Court finds the ALJ did not err in step five.

## V.    CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **AFFIRMED**.


**SO ORDERED.**


Date: _09/23/2013_____

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

14